# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| |
|---|
| In re<br><br>BRIAN R. MCQUILLIN,<br><br>                  Debtor<br><br>CHRISTIAN F. REISS and<br>BETTERBUILT CONSTRUCTION, LLC,<br><br>                  Plaintiffs<br><br>v.<br><br>BRIAN R. MCQUILLIN, |

Chapter 7
Case No. 10-15287-FJB

Adversary Proceeding
No. 10-1223

## MEMORANDUM OF DECISION

By their complaint in this adversary proceeding, plaintiffs Christian F. Reiss ("Reiss") and

BetterBuilt Construction, LLC ("BetterBuilt" or the "Company" or the "LLC"), of which Reiss is a fifty-

percent member and co-manager, seek a determination that the unliquidated debts owed them by

defendant and chapter 7 debtor Brian R. McQuillin ("McQuillin"), the other fifty-percent member and

co-manager of BetterBuilt, are excepted from discharge by 11 U.S.C. § 523(a)(2)(A) and (a)(4).  The debts

in question are for unliquidated liability arising from alleged self-dealing by McQuillin from the assets of

BetterBuilt.  After a trial, the court now enters the findings and rulings set forth below.

## I.      Procedural History

McQuillin filed a petition for relief under chapter 7 of the Bankruptcy Code on May 14, 2010.  In the case thereby commenced, Reiss and BetterBuilt timely filed a complaint for determination of the dischargeability of the debts owed them by McQuillin.  McQuillin has received a chapter 7 discharge.

By their complaint in this adversary proceeding, the plaintiffs seek determinations of nondischargeability under 11 U.S.C. § 523(a)(2)(A) (for debts for money obtained through false pretenses) and (a)(4) (for debts arising from defalcation while acting in a fiduciary capacity and embezzlement) as to their claims for liability against McQuillin.  To date, the underlying claims have not been liquidated.  Though the plaintiffs have not exhaustively identified their underlying claims, it is clear that these include, for the most part, claims of embezzlement, breach of fiduciary duty to the LLC and to Reiss as fellow member of the closely held entity, and breach of the LLC's operating agreement.[1] McQuillin opposes the complaint.  The parties tried the matter over three days and, after trial, submitted proposed findings and rulings and post-trial briefs.

## II.      Findings of Fact

Reiss is a carpenter who did business under the name Reiss Carpentry.  McQuillin, his neighbor, is a landscaper who did business through a wholly-owned corporation, Green Scenes Horticultural Services, Inc. ("Green Scenes").  In January 2005, Reiss and McQuillin formed BetterBuilt Construction LLC, a Massachusetts limited liability company of which each was an operating manager and a 50 percent member.  At the time of formation, they entered into an operating agreement as to BetterBuilt (the "Operating Agreement").  In it they agreed that:  (i) the Company shall distribute to the members from time to time, in such manner as determined by the operating managers, "all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working

---

[1] The complaint includes no count for adjudication of the underlying liability, only counts for determination of dischargeability of unspecified liability.

capital requirements of the Company" ("Cash Flow"); (ii) Cash Flow allocated to the members shall be allocated among them in the ratio of their total contributed capital; (iii) net profits and net losses, and each item of income, gain, loss, deduction, or credit entering into the computation thereof, shall be allocated to the members in the same proportions that they share in distributions of Cash Flow; and (iv) operating managers shall vote in proportion to their membership interests, and, subject to exceptions not applicable here, all decisions shall be by a majority in interest.  Insofar as each member at all times had a 50 percent interest, this last requirement effectively required that decisions be made by agreement of Reiss and McQuillin.  Reiss and McQuillin each initially contributed $150,000 to the Company; each raised the funds for his contribution by taking an equity loan against his primary residence.

In the Company's first year, Reiss, with the assistance of his wife, an accountant, maintained the Company's books, paid its bills, and made its distributions to members.  In 2006, when his wife no longer had time to devote to the task, Reiss asked McQuillin to take over the bookkeeping.  McQuillin agreed.  Thenceforth McQuillin alone kept the Company's books and checking account, paid its debts, and made its distributions to members.  Reiss did not review McQuillin's accounting and disbursements or ask questions about these; nor did McQuillin ever keep Reiss abreast of the disbursements he made to himself, Green Scenes, and third parties for his or Green Scene's benefit.  From January 1, 2006 forward, all checking account statements of BetterBuilt were mailed to McQuillin's residence.

In 2005, after BetterBuilt had successfully completed a number of small jobs, Reiss and McQuillin decided to undertake a larger project:  they would acquire certain land in Lynnfield, Massachusetts and build on it an 8,000 sq. ft. luxury "spec" house (hereinafter the "spec house") for resale at what they hoped would be a considerable profit.  To that end, in September 2005, Reiss and McQuillin purchased and took joint title to the Lynnfield property for approximately $515,000 and an additional $15,189.69 in settlement charges.  Reiss and McQuillin funded this purchase with proceeds of

3

equity loans on their homes and with a new loan from Option One Mortgage Corp. in the approximate

amount of $530,000, secured by the Lynnfield property itself and by mortgages on Reiss's and

McQuillin's primary residences.  Later, to fund construction of the spec house, in October 2006,

BetterBuilt took out a construction loan from Stoneham Savings Bank in the amount of $1,250,000,

secured by a mortgage on the Lynnfield property and, again, by mortgages on Reiss's and McQuillin's

principal residences; the construction loan paid off and replaced the Option One purchase loan.

The parties agreed that they would build the spec house themselves, drawing on their

respective skills, and hire subcontractors to do the work they could not.  This would require each to give

up other paid work, so they agreed that, from the proceeds of the construction loan, BetterBuilt would

make regular distributions to the members to sustain them through the construction period.  I have no

evidence that they discussed or agreed on the amounts of these distributions.[2]  They did not agree to

pay one member more than the other.  McQuillin testified that these distributions were intended to be

in such amounts as each member needed to get him through the construction period, even if that

meant paying one member more than the other, subject to adjustment at the end of the project, so that

the total distribution from the project would be equal.  Reiss denies that they agreed to permit any

distribution to be unequal, and I find that they did not agree to unequal distributions.  The BetterBuilt

operating agreement required that distributions be made in proportion to the members' respective

interests, which were at all times equal; Reiss and McQuillin did not agree to depart from this rule.

McQuillin concedes that he made unequal distributions and paid himself considerably more

than he paid Reiss.   He did this without notice to Reiss that he was doing so, and Reiss was unaware

that he was doing so.  There is no evidence or even suggestion that the two members discussed and

---

[2] Moreover, although these payments were being made in lieu of the remuneration that each member might
receive from work that he could be doing elsewhere, Reiss and McQuillin did not tie these payments to the
amount of work that either member performed on the Lynnfield project.  They did not keep records of the time
each spent on the project, quantify the value of each member's contribution of labor, or treat each member's
labor on this project as a capital contribution to the Company.

jointly authorized these unequal distributions or any kind of loan or advance from BetterBuilt to McQuillin or Green Scenes.

McQuillin made the distributions to himself in at least six ways.

- First, he made distributions from BetterBuilt directly to himself.  He made six of these from October 2006 through January 2007; these totaled $10,000, including four distributions of $2,000 and two of $1,000.  He also made another eight such transfers, totaling $12,000, from December 2008 through April 2009.

- Second, he made some 40 distributions from BetterBuilt to Green Scenes for his own personal benefit (not on account of any obligation to Green Scenes), and then forwarded most of these from Green Scenes' checking account to his own personal account at the same bank.[3]  These distributions were made from December 18, 2006 through January 23, 2008 and totaled $93,500.  Together with the distributions directly to himself in the previous paragraph, he made distributions to himself totaling $115,500.  In the same period—October 2006 through April 2009—he made distributions to Reiss of only $44,200.  The distributions to himself were authorized to the extent that they matched the distributions to Reiss, $44,200; the remaining distributions, totaling $71,300, were unauthorized.

McQuillin contends that these distributions were justified because he needed them for his support; though I have found elsewhere that the parties did not agree that each could take whatever was necessary for his support, regardless of whether it resulted in unequal distributions, I further find that he has also not established that the

---

[3] He contends he made these transfers through Green Scenes for tax purposes, on the advice of his accountant. The evidence shows that the tax purpose was to avoid paying federal self-employment taxes that should properly have been paid on these distributions, by making it appear that he was receiving the income as dividends from Green Scenes instead of as salary from BetterBuilt (which in fact they were).  The accountant testified that he did not remember ever having so advised McQuillin.  On the basis of these facts, I may and do draw negative inferences about McQuillin's credibility and honesty in his business dealings.

distributions to himself in excess of the amount he distributed to Reiss were necessary

for his support. Aside from his own conclusory testimony on the subject, he has offered

no evidence on that issue; and, especially where Green Scenes continued in operation

during the two years of the Lynnfield project, it is hardly self-evident that he needed

more than $44,200 for his support.

McQuillin also now seeks a finding that some of the distributions he made

through Green Scenes—he identifies no specific payments and no definite amount—

were compensation to Green Scenes for BetterBuilt's use of Green Scenes' heavy

equipment: a mini-excavator, a trailer, a skid-steer, a dump truck, and a tractor. Green

Scenes loaned this equipment to BetterBuilt for a period of months, and BetterBuilt

used it extensively on the Lynnfield job. In 2007, Reiss agreed with McQuillin that

BetterBuilt should, to some extent, reimburse Green Scenes for this use, but they did

not agree on or even discuss an amount. Reiss told McQuillin to take "a few months'

payments"—referring to the monthly carrying costs to Green Scenes for some of the

equipment. Reiss did not specify how many months' payments—just "a few"; and the

amount of the payments was also not clear. McQuillin in any event felt that a few

months' payment was inadequate, but he did not say so, and they discussed the subject

no further. McQuillin never made a payment from BetterBuilt to Green Scenes for this

purpose; the payments to Green Scenes were all distributions to McQuillin for his

support.[4]

---

[4] Years later, McQuillin instructed his accountant to characterize some $36,000 of these payments as rental payments to BetterBuilt for the equipment. McQuillin settled on the figure of $36,000 based on a daily rental rate of the same equipment from third-party vendors, but this rate is unfair because BetterBuilt would not have leased the equipment at a daily rate, but at a lower long-term rate. McQuillin does not now ask me to find that $36,000 is a fair valuation—he offers no specific amount at all—and he has offered no credible evidence for a fair valuation.

- Third, he used BetterBuilt's credit card (for which Reiss was also personally liable) for personal expenses, including (without limitation) $1,200 for ferry and hotel expenses for a family vacation, $500 for heating oil for his home, and approximately $2,300 in personal restaurant charges.[5]  This use of the card for personal purposes was not authorized.  The fact that Reiss, too, twice used a company card for personal purposes, for total purchases of less than $100, does not establish an agreement between the parties to permit personal use.  McQuillin was not aware of Reiss's personal uses, so those uses cannot possibly have caused McQuillin to believe that Reiss agreed to personal use—much less on the scale effected by McQuillin.  At most Reiss's personal uses of the Company card show that each member is guilty of an infraction, one minor, the other quite substantial.

- Fourth, he used BetterBuilt's credit card to pay expenses of Green Scenes that (i) BetterBuilt had no preexisting agreement with Green Scenes to cover, (ii) McQuillin did not clear with Reiss, and (iii) appear to be grossly in excess of reasonable compensation for the value supplied by Green Scenes to BetterBuilt for the payments in question; to the extent that these payments were excessive or unauthorized, they were de facto distributions to McQuillin.  These include (again without limitation) the portion—which is substantial but, on the present record, not precisely quantifiable—of the $14,587.64 in McQuillin's charges for gasoline and diesel fuel that were incurred for the benefit of Green Scenes.

- Fifth, he made payments from BetterBuilt to third parties in satisfaction of obligations of Green Scenes to these third parties, ostensibly to reimburse Green Scenes for having incurred these obligations on BetterBuilt's behalf, but in amounts that (i) were not fixed

---

[5] I do not include in this sum the three charges for business lunches shared by Reiss and McQuillin, which were appropriately charged to BetterBuilt.

by preexisting agreements between BetterBuilt and Green Scenes, (ii) McQuillin did not

clear with Reiss, and (iii) appear to be grossly in excess of reasonable compensation for

the value supplied by Green Scenes to BetterBuilt.  Again, to the extent that these

payments were excessive or unauthorized, they were de facto distributions to

McQuillin.  These payments include, without limitation, payments to Sprint for

McQuillin's cell phone service.

McQuillin argues that the cell phone, which belonged to Green Scenes, was

used during the relevant periods almost exclusively for BetterBuilt, and that there were

many months before 2007 during which the phone was used for BetterBuilt but was

paid for entirely by Green Scenes.  I find that the cell phone was used both for Green

Scenes and for BetterBuilt, and that while it might have been fair for BetterBuilt to

reimburse Green Scenes for some fraction of the cell phone cost, the amount is unclear.

For some of the months in issue, such as after the foreclosure, it is clear that no fraction

was justified.  Also, Reiss and McQuillin never agreed on or even discussed the extent to

which BetterBuilt should pay for the cell phone service; any such discussion would have

to include consideration of all the areas in which the parties' contributions to the spec

house project were unequal:  Green Scenes' contribution of heavy equipment and cell

phone use, Reiss's contribution of more time to the project than McQuillin contributed

in many months[6]; and Reiss's contribution of his home workshop for the extensive work

of fashioning the doors for approximately 150 custom cabinets.  Reiss neither asked for

nor received compensation for those areas in which he contributed more.

---

[6] Reiss gave up all outside work for the Lynnfield project until the fall of 2008, when it became necessary for him to earn money to take outside work.  McQuillin continued to run Green Scenes throughout the landscaping seasons in both 2007 and 2008, and consequently spent less time on the project than Reiss.

- Sixth, he made payments directly from BetterBuilt to third-party vendors for goods and services provided by those vendors to McQuillin personally; this includes, for example, ten checks, written from May 17, 2007 through May 11, 2008, totaling $4,450 to Cain Oil for heating oil for McQuillin's home.[7]

- And seventh, he made numerous ATM withdrawals of cash from BetterBuilt's bank accounts and has not accounted for any use to which these were put on behalf of BetterBuilt.

McQuillin testified that it was always his intent that, once the house sold and the parties were dividing the net proceeds, they would make adjustments for any inequality in these interim distributions, so that, in the final analysis, total distributions would be equal. I disbelieve this testimony for several reasons: (i) McQuillin never explained how this adjustment would be possible if the project resulted in a net loss, as surely he contemplated it might[8]; (ii) he made many of these distributions even as the Company did not have sufficient cash to pay its bills as they came due; (iii) McQuillin operated under no illusion that the success of the "spec house" venture was assured, and he always knew that it was possible that project expenses would not be paid in full, that the project would result in a net loss, and that this loss would render BetterBuilt insolvent and unable to equalize the distributions from its own resources; (iv) many of the distributions to himself he made through Green Scenes or in the form of payments to third parties for his benefit, which made it difficult to determine whether and by how much he had been favored by the interim distributions[9]; (v) he made these differential disbursements without first obtaining Reiss's agreement to his doing so or even informing Reiss that he was that he was doing

---

[7] The record shows that BetterBuilt made eleven payments, totaling $4,950, to Cain Oil for McQuillin's residence. Ten were in the form of direct payments from BetterBuilt's checking account to Cain Oil. The eleventh, for $500, was made on BetterBuilt's credit card.

[8] McQuillin does not suggest that he had the means to repay these advances other than from anticipated profits from sale of the spec house.

[9] This was especially true because, as he later did, McQuillin could blur the lines even further by claiming that some payments were reimbursement of Green Scenes, not payments for his own support.

so; (vi) he did not keep an accounting of the distributions he made to himself, and he failed to

distinguish (in BetterBuilt's records, to the extent he kept any at all) between those distributions to

Green Scenes that were for his own benefit and those payments to Green Scenes that were payments to

Green Scenes for services or goods it supplied to BetterBuilt. In any event, even if he intended at the

end of the day to equalize the distributions between them, McQuillin made these unequal distributions

in disregard of the applicable provisions of the BetterBuilt Operating Agreement and his obligations to

Reiss and BetterBuilt thereunder.  He was no more authorized to make loans or temporary advances

from BetterBuilt to himself than he was to take these advances without intent to "even up" or repay.

Either he was aware of the requirements of the Operating Agreement (requiring equal distributions and

majority—meaning joint—authorization of any departure therefrom) and disregarded them, or he failed

to familiarize himself with them and made the unequal distributions in willful ignorance of its

requirements.  Regardless of his knowledge of the operating agreement, McQuillin was not unaware of

the parties' mutual understanding that distributions were to be equal.  He well knew and understood

that his distributions to himself, in amounts far in excess of the distributions to Reiss, were contrary to

their agreement and, in view of the fact that the Lynnfield project was never assured of solvency,

contrary to the interests of BetterBuilt.

 Construction began in late 2006 or early 2007.  The start of construction was delayed by

permitting and other considerations.  Construction continued through 2007 and well into 2008.

BetterBuilt exhausted its construction funding and was unable to sell the house in time to pay the

construction loan.  In October 2007, BetterBuilt had to begin making monthly interest payments on the

loan (until then, no interest payments had been necessary).  By January 2008, Reiss and McQuillin had to

begin contributing money to BetterBuilt in order to fund these monthly interest payments, a total of

approximately $10,000 per month. Reiss and his wife paid a total of $40,000 for these interest charges

through September 2008.

McQuillin informed Reiss of the amount of these monthly interest payments, and Reiss relied on this information to know the amount of his 50 percent share of that obligation. Each month, he would send a check to McQuillin for his 50 percent share, and McQuillin would forward this sum with his own share to Stoneham Savings. The interest rate on the construction loan was variable and, at some point while Reiss and McQuillin were making these interest payments, decreased, resulting in a decrease of the monthly interest obligation. McQuillin failed to inform Reiss of this decrease, as a result of which Reiss continued making payments, now in an amount larger than his share; and McQuillen simply funded the difference, resulting in a lesser contribution on his part. I find that McQuillin, who regularly noted their different contributions in BetterBuilt's check register, was aware of the lower interest rates and of the different contributions each was making; and he failed to inform Reiss precisely to ease the burden on himself and to foist more of it on Reiss, in violation of their agreement to share the burdens equally.

Around the fall of 2008, McQuillin told Reiss that they had exhausted the proceeds of the construction loan and needed to apply for further financing to finish construction of the spec house. This alarmed Reiss, who was surprised that BetterBuilt had run out of money. He hired an attorney, obtained BetterBuilt's banking records, and, with the help of his wife, reconstructed the disposition of the LLC's funds. By this effort, Reiss learned for the first time that McQuillin had been distributing funds to himself, mostly through Green Scenes, in amounts in excess of distributions he had made to Reiss.

Around this time, Reiss, who had until then been working on the spec house full time, left the project to take on a separate job of his own. He did this, and needed to do this, both to raise money to fund further payments on the construction loan and to raise income for his own support, the monthly distributions from BetterBuilt having been discontinued. During this time, he worked on the outside job on weekdays; but he continued working full time on finishing the spec house on the weekends.

BetterBuilt began marketing the house in 2008, first with one broker and then another. McQuillin oversaw BetterBuilt's marketing efforts; Reiss had little personal involvement in the process except that, through counsel, he strongly and continuously urged McQuillin and the broker to lower the asking price considerably.  He feared the house would be sold at foreclosure before anyone would offer the price McQuillin was seeking.  This was a realistic concern, and it became especially urgent after the economic downturn in September 2008.  Initially, McQuillin, in consultation with the brokers, settled on an asking price of $3 million.  Eventually, however, he did lower the asking price to $2.5 million, then to $2 or $1.9 million, and finally to $1.75 million.

In the end, they were unable to sell the house before, in February 2009, Stoneham Savings Bank foreclosed its mortgage on the property by exercise of its power of sale.   The sale price appears not to be in evidence, but the evidence does show that the debt to Stone Savings in the month before foreclosure was $1.42 million and that the proceeds of the foreclosure sale did not fully satisfy BetterBuilt's debt to Stoneham Savings Bank but left a deficiency of $249,472.  At that point, BetterBuilt was insolvent, with no cash, few assets to liquidate, and total debt of $357,226.87.  This included the deficiency to Stoneham Savings, for which Reiss and McQuillin and their principal residences were also liable, and $22,620.51 on a Bank of America Visa credit card account, for which Reiss and McQuillin were both also personally liable.  At the time of the foreclosure sale, the house, though substantially completed, remained incomplete in small respects; most notably, approximately 150 cabinet doors, which Reiss himself had built and delivered to the Property, had not been installed on the cabinets (which themselves *were* already in place).

III.    Jurisdiction

The matter before the court is a complaint under 11 U.S.C. § 523(a) to determine the dischargeability of a debt.  The matter arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing

order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core

proceeding.  28 U.S.C. § 157(b)(2)(I) (core proceedings include determinations of the dischargeability of

particular debts).  This court accordingly has authority to enter final judgment in the matter.  28 U.S.C. §

157(b)(1).

## IV.    Discussion

The Plaintiffs contend that their claims against McQuillin for self-dealing—including (among

others) overpayment of distributions, use of the Company credit card for personal expenses, and

BetterBuilt's payment of McQuillin's personal expenses for gas and heating oil—are excepted from

discharge on each of four distinct bases.  First and foremost, they contend that these misappropriations

of Company funds constitute embezzlement under § 523(a)(4).  In the alternative, they contend that the

misappropriations constitute defalcations while acting in a fiduciary capacity under § 523(a)(4), fraud

while acting in a fiduciary capacity under § 523(a)(4), and the obtaining of money by "false pretenses, a

false representation, or actual fraud" under § 523(a)(2)(A).  With respect to each basis, Reiss, as the

party seeking to establish the nondischargeability of a debt, bears the burden of proving each element

of the exception by a preponderance of the evidence.  *Palmacci*, 212 F.3d at 787 (citing *Grogan v.

Garner*, 498 U.S. 279, 291 (1995)).

### a.    Embezzlement

Subsection 523(a)(4) excepts from discharge "any debt . . . for . . . embezzlement."  11 U.S.C. §

523(a)(4).  Embezzlement in § 523(a)(4) is "the fraudulent conversion of the property of another by one

who is already in lawful possession of it."  *In re Sherman*, 603 F.3d 11, 13 (1st Cir. 2010) (defining

embezzlement as used in § 523(a)(4)).  "Thus, to amount to embezzlement, conversion must be

committed by a perpetrator with fraudulent intent."  *Id*.  Embezzlement accordingly requires proof that

(i) property in the perpetrator's lawful possession but (ii) belonging to another (iii) was appropriated by

the perpetrator in a manner inconsistent with the property rights of the other and the scope of his or

her authorization to deal with the property (iv) with fraudulent intent.  *Id*.  "It is knowledge that the use

is devoid of authorization, scienter for short . . . that makes the conversion fraudulent and thus

embezzlement." *Id*.

### i.      Ownership and Possession

In each instance, the funds in question were property not of McQuillin but of BetterBuilt.  They

consisted of (i) monies invested in BetterBuilt by Reiss and McQuillin, (ii) monies advanced to BetterBuilt

by Stoneham Savings Bank under the construction loan, and (iii) monies loaned to BetterBuilt through

McQuillin's use of the Company's credit card.[10]  This is the universe of monies at issue, and all belonged

to BetterBuilt.  McQuillin argues (in the only argument of law he makes against a determination of

embezzlement) that there can be no embezzlement here because he was an owner BetterBuilt and, as

such, an owner of BetterBuilt's funds.   He cites no authority for this proposition, which I conclude has

no merit.  McQuillin owned an interest in BetterBuilt.  He had no interest in BetterBuilt's assets.  To be

sure, as an operating manager of the LLC, he was lawfully in possession of its funds, including all funds at

issue—and I so conclude—but neither this possession nor his membership interest in the LLC gave him

an interest in the LLC's assets.  The funds in issue were the property of BetterBuilt, not of McQuillin.

### ii.      Conversion

In each instance, McQuillin appropriated this property in a manner inconsistent with the

ownership rights of BetterBuilt.

---

[10] In a credit card transaction, the lender advances monies to a merchant on behalf of the borrower.  The monies
advanced do not actually pass through the hands of the borrower, but the advance is nonetheless of monies
borrowed by the borrower, and it is made at the borrower's direction and instigation, effected by the borrower's
use of the card (or account).  However, even if a credit card transaction is not viewed as one involving an
appropriation of the borrower's own funds, it does at least involve an appropriation of the borrower's credit,
which is itself an asset (purchased and paid for by interest and other financing charges) and capable of being
misappropriated by one in lawful possession of it, as was McQuillin.  In short, I am satisfied that the misuse of a
company credit card by one authorized to use the card on behalf of the company can be embezzlement within the
meaning of § 523(a)(4).

McQuillin was authorized to use Company funds to make disbursements to the members in equal amounts.  Having disbursed $44,200 to Reiss—Reiss clearly was aware of the disbursements to himself and, having accepted them, must be deemed to have agreed or consented to their amount— McQuillin had authority to disburse the same amount to himself.  He disbursed far more than this to himself (always through Green Scenes), and the disbursements in excess of $44,200 were unauthorized and inconsistent with the ownership rights of BetterBuilt.  In order to make disbursements in unequal amounts, he would have needed to obtain Reiss's agreement, but he never sought or obtained it.  His protestation that the parties had agreed that they would disburse to each member however much each needed or asked for, subject to later equalization upon sale of the Lynnfield Property, is neither plausible nor supported by the evidence.

McQuillin also had authority to use Company funds to pay for expenses of the Company.  Where he used Company funds to pay third parties for his own expenses, these uses were unauthorized and inconsistent with the rights of BetterBuilt.  Where he used Company funds to pay third parties for expenses of Green Scenes, these uses, too, were unauthorized and inconsistent with the rights of BetterBuilt.

McQuillin also had authority to use Company credit cards for Company purchases.  Where he used Company credit cards to pay either for his own personal expenses or the expenses of Green Scenes, these uses of the Company's borrowed funds and/or credit were unauthorized and inconsistent with the rights of BetterBuilt.

### iii.  Fraudulent Intent

As to each instance of alleged embezzlement, Reiss must prove that McQuillin's conversion of the funds in question was done with fraudulent intent.  *In re Sherman*, 603 F.3d at 13.  "It is knowledge that the use is devoid of authorization, scienter for short . . . that makes the conversion fraudulent."  *Id*. Fraudulent intent can rarely be proven by direct evidence; therefore, in attempting to discern it, the

court should consider the totality of the circumstances, including inferences from circumstantial facts. *Palmacci v. Umpierrez*, 121 F.3d 781, 790 (1st Cir. 1997), citing *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir.1994) ("circumstantial evidence may be sufficiently potent to establish fraudulent intent beyond hope of contradiction"); *Putnam Resources v. Pateman*, 958 F.2d 448, 459 (1st Cir.1992) ("It is black letter law that fraud may be established by inference from circumstantial facts.").

McQuillin argues, as a matter of law, that embezzlement cannot exist where the debtor lacks fraudulent intent because he believes he is the real owner. I agree that where a debtor believes he is the real owner, and therefore believes he is free to dispose of the asset in question as he sees fit, he lacks the scienter required for the kind of fraudulent intent required by § 523(a)(4). It is not clear whether McQuillin also contends, as a matter of fact, that he believed that the funds in question were, in any of the many instances at issue, his own. If and to the extent that he seeks a finding to that effect, I find, to the contrary, that Reiss has established, by well in excess of a preponderance of the evidence, that at all relevant times McQuillin knew and understood that the funds at issue belonged to BetterBuilt and not to himself. His own constant refrain—that he intended at the end of the day to account and adjust for overpayments to himself—would make no sense if he did not believe he was appropriating monies and credit that belonged to BetterBuilt. He suffered from no misunderstanding about ownership.

The larger and more pertinent question is whether, as to each use of funds in issue, McQuillin used the funds with knowledge that the use was devoid of authorization. McQuillin does not deny this, at least not in so many words, but the burden of proof is on Reiss, and McQuillin has at least taken the position that the uses were authorized. For the sake of argument, I will assume he takes the position that, in each instance, he made the appropriation *believing* his use of BetterBuilt funds was authorized. I have found that, in each instance, McQuillin knew and believed otherwise: that his appropriations of BetterBuilt monies and credit were unauthorized and inconsistent with his obligations to BetterBuilt and

16

Reiss under the operating agreement.  He therefore made the misappropriations with the fraudulent

intent required to constitute embezzlement under § 523(a)(4).

### iv.    Conclusion as to Embezzlement

Having found that the various misappropriations satisfy each of the requirements of

embezzlement under § 523(a)(4), I conclude that the resulting debt to BetterBuilt and to Reiss is

excepted from discharge as a debt for embezzlement.  The resulting debt includes the following:  (i)

repayment to BetterBuilt of the monies misappropriated, with interest; (ii) compensation for credit card

debt incurred inappropriately, including interest, late fees, and finance charges thereon; (iii)

consequential damages, if any, such as lost profits to BetterBuilt and, through BetterBuilt, to Reiss,

resulting from the hastened illiquidity and insolvency that were the natural consequence of the

embezzlement; (iv) liability directly to Reiss for his own liability, as co-obligor, on that portion of the

Company's credit card debt that McQuillin generated through unauthorized use of the Company credit

card; (v) liability directly to Reiss for his own liability, as guarantor or co-obligor, on those portions of

other obligations of BetterBuilt (such as to Stoneham Savings Bank and Reading Lumber) that, but for

the misappropriations, could and should have been paid by BetterBuilt; and (vi) any multiple damages

that may be awarded to BetterBuilt or Reiss on account of the embezzlement.

### b.    Defalcation While Acting in a Fiduciary Capacity

Section 523(a)(4) also excepts from discharge any debt for "defalcation while acting in a

fiduciary capacity."  11 U.S.C. § 523(a)(4).   It requires proof of two things:  that the debtor have acted as

the fiduciary in a fiduciary relationship; and that his or her conduct in that capacity have constituted a

defalcation.

Federal law determines whether a fiduciary relationship exists under § 523(a)(4). The "broad

definition of fiduciary under nonbankruptcy law—a relationship involving trust, confidence, and good

faith—is inapplicable in the nondischargeability context." *Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 687

(B.A.P. 1st Cir. 2012) (quoting *Honkanen v. Hopper (In re Honkanen)*, 446 B.R. 373, 378-79 (B.A.P. 9th Cir.

2011)). Under federal law, a fiduciary relationship arises by virtue of an express or technical trust. *Davis*

*v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934); *Rutanen v. Baylis* (*In re Baylis)*, 313 F.3d 9, at 17 n.3

(1st Cir. 2002). "The elements of an express trust have traditionally included an explicit declaration of

trust, a clearly defined trust res, and an intent to create a trust relationship." *Fahey*, 482 B.R. at 687. No

express trust is claimed here, so the Court must determine whether a technical trust existed.

"A technical trust is one that arises under statute or common law." *Petrucelli v. D'Abrosca (In re*

*D'Abrosca)*, 2011 WL 4592338, at *5 (B.A.P. 1st Cir. Aug. 10, 2011); *M-R Sullivan Mfg. Co., Inc.  (In re*

*Sullivan)*, 217 B.R. 670, 675 (Bankr. D. Mass. 1998). Where, under state law, directors and officers of a

corporation have had fiduciary duties to the corporation and to its shareholders, courts have held that

these officers and directors acted in a fiduciary capacity within the meaning of § 523(a)(4). *Sullivan*, 217

B.R. at 676 and cases cited. This fiduciary relationship of officers and directors to their corporation

exists in Massachusetts, whose law governs here. See *In re Snyder*, 101 B.R. 822, 831-32 (Bankr. D.

Mass. 1989) (collecting cases). And, in the case of closely held corporations, Massachusetts law also

imposes on stockholders a duty of "strict good faith" to one another. *Donahue v. Rodd Electrotype Co.*

*of New England, Inc.*, 367 Mass. 578, 592-94 (1975). This duty applies to any close corporation as

defined in the case law:  that is, an entity having "(1) a small number of stockholders; (2) no ready

market for the corporate stock; and (3) substantial majority stockholder participation in the

management, direction and operations of the corporation." *Pointer v. Castellani*, 455 Mass. 537, 549

(2009), citing *Brodie v. Jordan*, 447 Mass. 866, 868–869, 857 N.E.2d 1076 (2006) and *Donahue v. Rodd*

*Electrotype Co. of New England, Inc.*, 367 Mass. at 586. The Massachusetts Supreme Judicial Court has

applied it to a limited liability company whose structure fits this definition. *Pointer v. Castellani*, 455

Mass. at 549. I am confident that the Supreme Judicial Court would hold that the present LLC is a close

corporation and that, under *Donahue v. Rodd Electrotype* and its progeny, BetterBuilt's members are

subject to duties of strict good faith to one another.  Accordingly, I conclude that, as a member and

manager of the LLC, McQuillin acted in a fiduciary capacity, as that term is used in § 523(a)(4), toward

both the LLC and Reiss when he handled the funds and assets of the LLC and when he incurred debt in

the name of the LLC.

"Defalcation" in § 523(a)(4) requires a breach of fiduciary duty and must mean something other

than "fraud" and different from willful and malicious injury.  *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9,

17-18 (1st Cir. 2002).  Notwithstanding defalcation's broad dictionary meaning, not every default,

however innocent, will suffice.  A defalcation must involve either (i) moral turpitude, bad faith, or other

immoral conduct, or (ii) in lieu of these, an intentional wrong, which includes not only conduct that the

fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as

the equivalent, such as where the fiduciary consciously disregards, or is willfully blind to, a substantial

and unjustifiable risk that his conduct will turn out to violate a fiduciary duty.  *Bullock v.*

*BankChampaign, N.A.*, 133 S.Ct. 1754, 1759 (2013).  That risk "must be of such a nature and degree that,

considering the nature and purpose of the actor's conduct and the circumstances known to him, its

disregard involves a gross deviation from the standard of conduct that a law-abiding person would

observe in the actor's situation."  *Id*. at 1760.

I am satisfied that the various acts that constitute embezzlement (as determined above) also

constitute defalcations while acting in a fiduciary capacity.  McQuillin's actions were wrongful, in

violation of the BetterBuilt operating agreement and his fiduciary obligations to BetterBuilt and Reiss,

and he knew they were wrongful.   He did not intend to repay his misappropriations, but even if he had

operated under the belief that he would eventually make good for his self-favoring advances, this belief

could have been nothing but reckless—they had no assurance the house would sell for a profit—and

based in willful ignorance.  Accordingly, the debt that is excepted from discharge as embezzlement is also excepted from discharge as arising from defalcation while acting in a fiduciary capacity.

### c.      Fraud While Acting in a Fiduciary Capacity

In their complaint, the Plaintiffs seek a determination that the debts that have been excepted from discharge as embezzlement and defalcation while acting a fiduciary capacity are also excepted from discharge as debts for fraud while acting in a fiduciary capacity.  However, in their proposed findings of fact and conclusions of law and in their post-trial brief, the Plaintiffs have not separately briefed the issue of fraud in § 523(a)(4).  In view of my conclusions as to defalcation and embezzlement, this basis, if successful, would only supply further reinforcement for the conclusion that the debt at issue is excepted from discharge.  Accordingly, the Court sees no need to determine how fraud differs from defalcation in § 523(a)(4) and whether the acts in question constitute fraud.

### d.      False Pretenses, False Representation, or Actual Fraud under § 523(a)(2)(A)

Reiss and BetterBuilt also argue that McQuillin's liability to them is also excepted from discharge as debt arising from fraud or false pretenses within the meaning of § 523(a)(2)(A).  With respect to most of the debt at issue, their reliance on § 523(a)(2)(A) is cumulative:  it would merely supply one more basis, on top of two others already established, for excepting the debt from discharge.  Moreover, in order to establish nondischargeability under § 523(a)(2)(A), the Plaintiffs rely on  unconventional theories of fraud and false pretenses.  For these reasons, I will not address the dischargeability of the same debt under subsection § 523(a)(2)(A).

However, one component of the alleged liability has not already been addressed.  In particular, Reiss contends that McQuillin is liable to him for overpayments that he (Reiss) made through BetterBuilt of interest on the Stoneham Savings Bank loan as a result of McQuillin's deceitful failure to inform Reiss

that the amount of the monthly interest obligation, and therefore of each member's share thereof, had

decreased.  The dischargeability of this liability must be evaluated under subsection (a)(2)(A).

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt for money

obtained "by false pretenses, a false representation, or actual fraud[.]"  11 U.S.C. § 523(a)(2)(A).  Here,

the alleged false representation is an omission.  Reiss relied on McQuillin to tell him how much to pay

each month toward BetterBuilt's interest obligation on the Stone Savings loan, and, when the members

began having to fund that obligation, McQuillin did tell Reiss how much to contribute and did receive

McQuillin's monthly contributions to forward with his own matching contribution to Stoneham Savings;

but when BetterBuilt's monthly interest obligation decreased, McQuillin did not so inform Reiss but

allowed Reiss to continue contributing at the higher rate.  Here, Reiss argues, McQuillin had a duty to

disclose the reduced obligation, and his failure to do so was a fraudulent misrepresentation.

The First Circuit has determined that, to establish that a debt is nondischargeable because it was

obtained by a false representation, a creditor must show the following: "(1) the debtor made a

knowingly false representation; (2) the debtor intended to deceive; (3) the debtor intended to induce

the creditor to rely upon the false statement; (4) the creditor actually relied upon the

misrepresentation; (5) the creditor's reliance was justifiable; and (6) the reliance upon the false

statement caused damage."  *McCrory v. Spigel* (*In re Spigel*), 260 F.3d 27, 32 (1st Cir. 2001) citing

*Palmacci*, 121 F.3d at 786; *In re Burgess*, 955 F.2d 134, 139 (1st Cir. 1992) (as to elements other than

reasonableness or justifiability of reliance).  Intent to deceive need not be proven by direct evidence but

may be inferred from the totality of the circumstances.  *Palmacci*, 121 F.3d at 789.  For purposes of

determining whether reliance was justified, "the circumstances of the reliance claim must be taken into

account," and "the individual is not obliged to investigate statements made to him (although he cannot

shut his eyes to an obvious falsehood)."  *Lentz v. Spadoni  (In re Spadoni)*, 316 F.3d 56, 59 (1st Cir. 2003).

Each requirement is satisfied here.  Especially in view of his fiduciary obligation to Reiss as the

other member of the LLC, McQuillin, having undertaken to collect the members' contributions and

forward them from BetterBuilt to Stoneham Savings, was obligated to Reiss to notify him when that

obligation decreased.  His failure to do so was knowing and done with intent to deceive and to induce

reliance; and Reiss did rely on it, justifiably, and was damaged by that reliance, insofar as it caused him

to bear a disproportionate share of the interest expense.  The liability arising from that overpayment,

including all interest and consequential and punitive damages, is accordingly excepted from discharge

under § 523(a)(2)(A).

### e.    Liability for Overpricing

The Plaintiffs also apparently seek a determination that any liability McQuillin may have to them

for overpricing the home—and thereby causing it not to sell before Stoneham Savings eventually

foreclosed, resulting in a diminished return on the home—is also excepted from discharge.  The

Plaintiffs have not addressed how this liability, if it exists at all, might be excepted from discharge.  I do

not see that it fits into any of the theories on which they have relied.  It involves no embezzlement,

fraud, misrepresentation, or false pretenses; even if it constitutes a breach of fiduciary duty, the breach

is at worst negligent and does not rise to the level of fault required to constitute a defalcation under the

Supreme Court's decision in *Bullock*, 133 S.Ct. at 1759, as set forth above.  Therefore, any liability that

may arise from overpricing of the home is not excepted from discharge.

### f.    Conclusion

For the reasons set forth above, I conclude that the debt identified above as arising from

embezzlement, defalcation while acting in a fiduciary capacity, and a false representation is excepted

from discharge.  I make no determination as to the specific amounts in issue, leaving the same for

determination by another court of competent jurisdiction.  I will dismiss the complaint only to the

extent that it seeks to except from discharge McQuillin's liability (if any) for his refusal to market the

property at a lower price.  Judgment will enter accordingly.

Date:  April 15, 2014

_____
Frank J. Bailey
United States Bankruptcy Judge